**Gregory KRAMER, Appellant,**

v.

**Valerie MASON, Respondent.**

**No. 58451.**

Missouri Court of Appeals,
Eastern District,
Division Two.

March 26, 1991.

William L. Webster, Atty. Gen., Cynthia H. Hearring, Asst. Atty. Gen., St. Louis, for appellant.

Gregory F. Quinn, Frederick P. Johnston, Manchester, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Gregory Kramer, the superintendent of Bellefontaine Habilitation Center (Bellefontaine), appeals from a decision of the Circuit Court of St. Louis County affirming the July 28, 1989, administrative decision of the personnel advisory board disapproving and reversing respondent, Valerie Mason's, dismissal from employment. We affirm.

Respondent is a Developmental Assistant II[1] at Bellefontaine, a State owned and operated facility for the mentally retarded and developmentally disabled. On January 20, 1989, respondent was working the 2:15 p.m.—10:45 p.m. shift in cottage 1710 on the Bellefontaine grounds. About eight individuals or "clients" reside in cottage 1710 including the complainant below, Scott E.

The evidence reveals that on the evening of January 20, 1989, Bellefontaine was holding a dance for its clients. Due to an altercation with staff members earlier that day, Scott E. was not permitted to attend the dance. At approximately 7:30 p.m., Scott E.'s roommate, Daryl, returned from the dance and went into their room. Respondent testified that, as soon as Daryl returned, Scott E. "took off back there and started picking on him."

Respondent went back to the room and told Scott E. to stop teasing Daryl. Respondent then left the room. A few minutes later, respondent heard Daryl screaming at Scott to leave him alone. Respondent again walked into the room and told

Scott E. to stop misbehaving or she would talk to her supervisor about him not being allowed to go home for the weekend. At this point, Scott E. uttered an obscenity and told her she was a black female member of the canine family. Scott E. then began swinging at respondent. Respondent testified that Scott E. then fell back on his bed and kicked respondent in the chest. Respondent waited until Scott E. moderated his kicking, then respondent straddled Scott's legs, and held his arms. Respondent testified that she held Scott E. in this manner for a few minutes and, approximately every 30 seconds, asked him if he were calmed down. When he answered respondent in the affirmative, respondent let him get up. Respondent stated that she held Scott E. down for a total of three to five minutes. Respondent explained that the reason she held him down this long was because she had never seen him that agitated before and feared for the safety of his roommate if she let him up.

The following morning, Scott E. reported that respondent had choked him. An examination discovered a petechial rash on his neck consistent with pressure being applied in that area.[2] Margaret Main, a registered nurse with Bellefontaine testified that "a fair amount of pressure" is required to cause a petechial rash and that the rash would probably appear within an hour if a lot of pressure was applied.

Respondent was notified by a letter dated February 24, 1989, that she was being terminated. The reason given for the termination included, inter alia, the altercation that occurred on January 20, 1989, with Scott E. A hearing was held on June 6, 1989, before the personnel advisory board. No evidence of any other misconduct other than the January 20, 1989, incident was adduced at the hearing. On July 28, 1989, findings of fact and conclusions of law were handed down with the board finding that the testimony of Scott E. lacked credi-

1. A Developmental Assistant II is a nonprofessional position as a lead worker in implementing program plans in various areas related to patient welfare. The position involves some supervisory responsibility.

2. A petechial rash is a collection of minute red spots that indicate bleeding from blood vessels. It is not really a "rash" as that word is commonly understood.

bility and unanimously reversing the decision to terminate respondent. The decision of the board was affirmed by the Circuit Court of St. Louis County on April 30, 1990. This appeal followed.

■ We initially note that an appellate court sitting in review of an administrative agency reviews the findings and conclusions of the agency rather than the judgment of the circuit court. *Hudson v. Wellston School District*, 796 S.W.2d 31, 33 (Mo.App., E.D.1990). In conducting such a review, this court may only determine whether the board reasonably could have reached the decision it did. We may not substitute our judgment of the evidence and may not set aside the board's decision unless it is not supported by competent and substantial evidence on the whole record or is contrary to the overwhelming weight of the evidence. *Id.* In addition, the evidence must be considered in the light most favorable to the board's decision, together with all reasonable inferences where supported. *Id.* If evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination and it is irrelevant that there is evidence to support a contrary finding. *Id.* Finally, the determination of the credibility of the witnesses is a function of the administrative tribunal. *Id.*

■ Appellant first claims that the personnel advisory board misapplied the law to the facts in concluding that respondent, by straddling Scott E. on the bed and holding his arms down, did not commit physical abuse of a client as defined by Missouri Department of Mental Health Operating Resolution 2.205.

Physical abuse is defined in DOR 2.205 as "1. purposely beating, striking, wounding or injuring any client, or 2. in any manner whatsoever, mistreating or maltreating a client in a brutal or inhumane manner. Physical abuse includes handling a client with any more force than is reasonably or apparently necessary for a client's proper control, treatment or management." See also RSMo § 630.155 (1986).

In his initial brief, appellant hangs his hat on the phrase "handling a client with any more force than is reasonably or apparently necessary for a client's proper control, treatment or management." In his reply brief, appellant switched horses and relied on the language "mistreating or maltreating a client in a brutal or inhumane manner."

■ We feel compelled to point out that, as the board found that respondent merely straddled and held down Scott E., appellant's argument that respondent's actions rose to brutal or inhumane treatment are questionable. In addition, as this was first raised in appellant's reply brief, simple fairness precludes our consideration of whether the actions were brutal or inhumane. Reply briefs are solely to be used to "reply" to arguments made by respondents in their briefs to our court and not to raise new points on appeal. Any other holding would deny the respondent the opportunity to respond to appellant's allegations. *Big Boys Steel Erection, Inc. v. Hercules Construction Co.*, 765 S.W.2d 684, 687 (Mo. App., E.D.1989).

A consideration of the evidence before the board demonstrates the amphigoric nature of appellant's argument that the force used was more than "reasonably or apparently necessary." Scott E. was described by several witnesses, including himself, as a bad actor with a bad temper. Respondent had earlier warned him to behave and he refused to do so. When she approached him a second time, he started swinging at respondent and kicked her in the chest. Respondent testified that, although Scott E. had a bad temper, she had never seen him quite this physical with a staff member and was concerned for the safety of his roommate, Daryl. She waited for Scott E. to moderate his kicking, straddled him and held his arms. Scott E. then appeared to calm down. Appellant claims that respondent should have, at that point, allowed Scott E. up and that, in failing to do so, she committed physical abuse. We see no "abuse" in failing to let him up until she was sure he was calmed down.

Appellant next claims that the board erred in reversing the dismissal of respondent because its findings that respondent had not choked Scott E. were not based on competent and substantial evidence and because the board mistakenly interpreted certain evidence.

As noted earlier, this court only reviews the findings to determine if the board reasonably could have reached the decision it did. *Hudson*, 796 S.W.2d at 33. We may not substitute our judgment of the evidence for that of the board unless the board's decision is not supported by substantial and competent evidence. *Id.* The board below found that Scott E.'s testimony was not credible and was "confusing, contradictory and inconsistent." After reviewing the transcript, we find this to be an extremely accurate assessment of the testimony of Scott E. Scott E. initially testified that respondent choked him and that he saw marks on his neck immediately after the choking. Later in his testimony, Scott testified that the marks on his neck were self-inflicted. Nurse Main testified that the marks on Scott E.'s neck could have appeared within an hour of the choking, yet Irma Moore, one of respondent's supervisors testified that she went to cottage 1710 just after the incident and remained there for several hours and never saw any marks on Scott E.'s neck. Respondent denied ever choking Scott E. The board did not err. Point denied.

Appellant's final point is that the board was "arbitrary and capricious or unreasonable" and abused its discretion in failing to rule on certain objections during the cross-examination of Scott E.

Appellant has cited this court to 42 incidents where he claimed the board failed to rule on an objection. Although the board did not use the terms "overruled" or "sustained," in 39 of these incidents the board made its ruling clear by advising the attorneys to move on to the next question, to rephrase the question asked or by telling the witness to answer the question. In several of the incidents cited, the board did expressly sustain or overrule the objection posed.

As to the other objections which were not ruled on, this court first recognizes that technical rules of evidence do not control an administrative hearing. *Franklin v. Board of Directors School Dist. of Kansas City*, 772 S.W.2d 873, 883 (Mo.App., W.D.1989). In addition, since decisions rendered by an administrative body are presumed to be valid, appellants carry the burden of overcoming this presumption by establishing unfairness in the procedure. *Mueller v. Ruddy*, 617 S.W.2d 466, 475 (Mo.App., E.D.1981).

We have reviewed the testimony presented to the board and the objections made by appellant's counsel below.[3] Rather than find unfairness on the part of the board, we find it was admirably restrained in dealing with the situation. Appellant's attorney below requested leeway from the board during his direct examination of the victim and then relentlessly pounded the board with what were often frivolous objections, most of which were followed by a short speech. The testimony of Scott E. was confusing and he continuously contradicted himself. This made it very difficult to get a clear story on cross-examination. With his constant objections, appellant transformed the hearing from a proceeding to ascertain the truth into a battle, complete with snide remarks aimed at respondent's attorney. While we do not wish to discourage attorneys from making helpful objections, we will not countenance pointless objections made for the purpose of hearing oneself speak. The board was not unfair or biased against the appellant and its actions were not arbitrary or capricious. Point denied.

Affirmed.

CRANDALL, C.J., and CRIST, J., concur.

---

3. Appellate counsel did not represent appellant before the board below.